UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANICE RENAE MACIAG,

          Plaintiff,                  Case No. 2:18-cv-11540
                                            District Judge Avern Cohn
v.                                      Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY
ADMINISTRATION,

          Defendant.

_____/

**REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT (DE 13), GRANT DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (DE 14) and AFFIRM THE
COMMISSIONER'S DECISION**

**I.**    **RECOMMENDATION**:  For the reasons that follow, it is

**RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary

judgment (DE 13), **GRANT** Defendant's motion for summary judgment (DE 14),

and **AFFIRM** the Commissioner's decision.

**II.**    **REPORT**

       Plaintiff, Janice Renae Maciag, brings this action under 42 U.S.C. §§ 405(g),

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying her applications for disability insurance (DI) and

supplemental security income (SSI) benefits.  This matter is before the United

States Magistrate Judge for a Report and Recommendation on Plaintiff's motion

for summary judgment (DE 13), the Commissioner's cross-motion for summary

judgment (DE 14), and the administrative record (DE 10).

### A.    Background and Administrative History

Plaintiff alleges her disability began on February 21, 2015, at the age of 43.

(R. at 199, 197.)[1]  In her disability report, she lists several conditions (heart

disease, multiple heart attacks, high blood pressure, diabetes, depression, and sleep

apnea) as limiting her ability to work.  (R. at 216.)  Her applications for DI and SSI

benefits were denied in March 24, 2016.  (R. at 98-147.)

Plaintiff requested a hearing by an Administrative Law Judge ("ALJ").  (R.

at 151-152.)  On February 15, 2017, ALJ Allison Dietz held a hearing, at which

Plaintiff and a vocational expert (VE), James Lozer, Ed.D. testified.  (R. at 36-97,

260.)  On May 22, 2017, ALJ Dietz issued an opinion, which determined that

Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 17-

35.)

Plaintiff submitted a request for review of the hearing decision/order.  (R. at

190-192.)  However, on March 23, 2018, the Appeals Council denied Plaintiff's

---

[1] Plaintiff's applications were submitted in November 2015.  Although the DI
application summary lists an alleged onset date (AOD) of October 9, 2015, the SSI
application summary lists an AOD of February 21, 2015.  (*Compare* R. 197, *with*
R. 199.)

request for review.  (R. at 1-7.)  Thus, ALJ Dietz's decision became the

Commissioner's final decision.

Plaintiff timely commenced the instant action on May 16, 2018.

**B.    Plaintiff's Medical History**

The administrative record contains approximately 486 pages of medical

records, which were available to the ALJ at the time of her May 22, 2017 decision.

(R. at 268-753 [Exhibits 1F-15F].)  These materials will be discussed in detail, as

necessary, below.

**C.    The Administrative Decision**

Pursuant to 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), at **Step 1** of the

sequential evaluation process, the ALJ found that Plaintiff had not engaged in

substantial gainful activity since February 21, 2015, the alleged onset date (AOD).

(R. at 22.)  At **Step 2**, the ALJ found that Plaintiff had the following severe

impairments:  obesity, diabetes, coronary artery disease (CAD), sleep apnea,

depression, anxiety, carpal tunnel syndrome (CTS), major joint dysfunction, and

disorders of the spine.  (*Id*. at 22-23.)  At **Step 3**, the ALJ found that Plaintiff did

not have an impairment or combination of impairments that met or medically

equaled the severity of one of the listed impairments.  (*Id*. at 23-25.)  **Between**

**Steps 3 and 4** of the sequential process, the ALJ evaluated Plaintiff's residual

functional capacity ("RFC")[2] and determined that Plaintiff had the RFC to perform

sedentary work, with various other postural, manipulative, environmental, and

mental health limitations.  (*Id*. at 25-28.)  At **Step 4**, the ALJ determined that

Plaintiff was unable to perform any past relevant work.  (*Id*. at 28-29.)  At **Step 5**,

considering Plaintiff's age, education, work experience, and RFC, the ALJ

determined that there were jobs that existed in significant numbers in the national

economy that Plaintiff could perform, such as a surveillance system monitor and an

order clerk.  (*Id*. at 30-31.)  The ALJ therefore concluded that Plaintiff had not

been under a disability, as defined in the Social Security Act, from February 21,

2015, through the date of the decision.  (*Id*. at 31.)

### D.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final

administrative decision pursuant to 42 U.S.C. § 405(g).  When reviewing a case

under the Social Security Act, the Court "must affirm the Commissioner's decision

if it 'is supported by substantial evidence and was made pursuant to proper legal

standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see*

---

[2] The claimant's "residual functional capacity" is an assessment of the most the
claimant can do in a work setting despite his or her physical or mental limitations.
20 C.F.R. §§ 404.1545(a), 416.945(a); *Howard v. Comm'r of Soc. Sec*., 276 F.3d
235, 239 (6th Cir. 2002).

*also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a

decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### E.    Analysis

Plaintiff contends that the ALJ erred in her consideration of the opinion evidence and in her credibility assessment.  (DE 13 at 8-12.)[3]  The Commissioner contends that the ALJ properly assessed Plaintiff's RFC and subjective complaints. (DE 14 at 5-15.)

### 1.    Opinion evidence

In her review of the opinion evidence, the ALJ assigned:  **(a)** "limited weight" to the physical RFC assessment of state agency medical consultant Robin Mika, D.O. (R. at 108-111, 124-127); **(b)** "some weight" to the mental RFC assessment of state agency psychological consultant Rom Kriauciunas, Ph.D. (R. at 111-113, 127-129); **(c)** "great weight" to the consultative examination report of Hugh D. Bray, Ph.D., a licensed psychologist (R. at 587-592); and, **(d)** "partial

---

[3] Plaintiff's motion for summary judgment does not comply with this Court's formatting and type size requirements, *i.e.*, the text is less than double-spaced and smaller than 14-point font.  E.D. Mich. LR 5.1(a)(2),(3).  Although the Undersigned will recognize this brief, Plaintiff's counsel is cautioned that future filings may be rejected or stricken from the record if non-complaint with E.D. Mich. LR 5.1 ("Filing of Papers").  It must also comply with my Practice Guidelines for Social Security cases.

weight" to the medical source statement (MSS) of John Slaim, D.O., which was also signed by Michelle Dolson, ANP-BC (Adult Nurse Practitioner-Board Certified). (R. at 748-751). (R. at 27-28.)

### a. Physical RFC

#### i. Discounting Dolson's / Dr. John Slaim's MSS

Plaintiff treated with the Slaim Office -- Michelle Dolson, ANP-BC, *John Slaim*, D.O., *Abraham* Slaim, D.O. -- as early as April 23, 2013. (*See* R. at 303-378 [Ex. 2F], 560-573 [Ex. 5F], 593-615 [Ex. 9F], 635-736 [Ex. 12F]). The ALJ cited many of these exhibits in her review of Plaintiff's musculoskeletal impairments, diabetes, CAD and sleep apnea. (R. at 26-27.) As to musculoskeletal impairments, the ALJ noted, *inter alia*:

> However, despite these complaints, examination notes showed she was negative for joint pain, stiffness, muscle pain, tenderness, edema, or weakness (EX. 1F/29; 2F/10; 4F/20, 28; 88, 97 [R. at 296, 312, 401, 409, 469, 478]). The claimant generally had normal strength, sensation, range of motion and reflexes throughout her body (EX. 4F/25, 29, 88 [R. at 406, 410, 469]).

(R. at 26.)

Then, in assigning "partial weight" to the functional limitations set forth in Dolson's / Dr. John Slaim's January 16, 2017 MSS, the ALJ explained:

> While the claimant would be limited to a range of sedentary work, there is no evidence that the claimant is limited to this degree. Her examination notes showed she was negative for joint pain, stiffness, muscle pain, tenderness, edema, or weakness. The claimant generally

had normal strength, sensation, range of motion and reflexes
throughout.

(R. at 28, 750.)  In other words, the ALJ discounted Dr. Slaim's functional

limitations on the basis of the supportability and/or consistency factors.  20 C.F.R.

§§ 404.1527(c)(3),(4), 416.927(c)(3),(4).

Plaintiff takes issue with the ALJ's assignment of "only 'partial weight' to

the treating doctor, Dr. John Slaim."  (DE 13 at 8.)  Plaintiff argues that "Dr.

Slaim's records for over five years of consistent treatment, do support such finds

and such limitations."  (DE 13 at 9.)  Ultimately arguing that "Dr. Slaim's opinion

should be given great weight[,]" Plaintiff cites:

- Long lists of diagnoses, such as those in Dolson's January 12, 2016, March 1, 2016, May 13, 2016, and November 8, 2016 records.  (R. at 597-598, 606-607, 657-658, 703-705.)  For example, the latter two included low back pain potentially associated with radiculopathy, chronic right shoulder pain, CAD, and chronic peripheral venous insufficiency (R. at 657) and right arm pain, bowel and bladder incontinence, and lumbar herniated disc "with [right] leg radiculopathy and loss of bladder and bowel function . . . [,]"  (R. at 704).[4]

- Dolson's May 13, 2016 records, which noted "mid thoracic and lower back" pain, continued "right arm, shoulder pain[,]" numbness and tingling in both hands, an "EMG that showed mild CTS."  (R. at 653.)  At the same visit, Plaintiff sought a second opinion for her CAD, as she was "told that there was one vessel that is almost 100% blocked and that her

---

[4] With respect to the long list of diagnoses, Plaintiff also cites Ex. 12F at 102.  (DE 13 at 9.)  However, that record is a May 13, 2016 radiological report.  (R. at 736.)  Instead, it appears that Plaintiff intended to cite Ex. 12F at 70.  (R. at 704.)

Cardiologist states he could not fix, and then stated that he could." (R. at 654.)[5]

- Dolson's November 8, 2016 notes regarding Plaintiff's right shoulder, namely "[a]ssociated symptoms include decreased mobility[,]" and "[p]ertinent negatives include swelling[,]" as well as notations that Plaintiff had limited range of motion in her right arm, was unable to lift up on shoulder level, and had numbness and tingling to the right upper extremity (R. at 691)

(DE 13 at 7, 9.)

Plaintiff's argument is unavailing. As for the treating source's long lists of diagnoses, "[t]he mere diagnosis of [a condition] says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). Moreover, to the extent the other notes reference Plaintiff's reports during the "history of present illness," they are more appropriately evaluated in a credibility argument. *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990) (a multidisciplinary examination report failed to provide "objective evidence of a condition of disabling psychological pain" where it was based on "claimant's subjective complaints."). In the present appeal, Plaintiff's credibility argument, which is addressed below, is limited to compliance with cardiac rehabilitation and diabetes treatment and her hearing testimony. (DE 13 at 10-12.) Finally, and

---

[5] At the administrative hearing, Plaintiff testified that she got a second opinion about the 100% blockage from Dr. Kondur of Dearborn Cardiology. (R. at 67; *see also* R. at 737-747 [May 24, 2016 - October 26, 2016].)

perhaps most importantly, as an ANP, Dolson is an "other source," rather than an "acceptable medical source."  *See* 20 C.F.R. §§ 404.1513(a),(d), 416.913(a),(d) (effective Sept. 3, 2013 to Mar. 26, 2017).[6]  Therefore, Plaintiff's citations to Dolson's notes do not supplant the ALJ's assignment of "partial weight" to the Dolson / Dr. John Slaim MSS.

### ii.     Exertional and manipulative limitations

Beyond Dr. Slaim's records, Plaintiff takes issue with the ALJ's failure to mention her "100% occlusion in [blockage of] the distal circumflex," or her "two right shoulder tears."  (DE 13 at 9-10.)  Here, Plaintiff expressly refers to:

- Abedelrahim Asfour, M.D.'s October 12, 2015 procedure, during which a "6 French sheath was placed in the [right] femoral artery[,]" the distal circumflex was "occluded 100%[,]" and the "[d]istal left circumflex artery d[id] not appear to be accessible percutaneously at this moment  . . . ."  (R. at 506-507, 380-381.)

- The April 20, 2017 right shoulder MRI, which revealed tears of the supraspinatus tendon and subscapularis tendon (R. at 752-753.)

(DE 13 at 9-10.)

---

[6] *See also Allums v. Colvin*, No. 1:14CV2429, 2015 WL 9282334, at *20 (N.D. Ohio Nov. 25, 2015) ("ANP Christy as a nurse practitioner and Ms. Ward and Ms. Maggit as a licensed social worker and mental health specialist are considered 'other sources' and not 'acceptable medical sources' under the Social Security Regulations."), *report and recommendation adopted*, No. 1:14 CV 2429, 2015 WL 9258507 (N.D. Ohio Dec. 17, 2015).

To be clear, the Undersigned does not interpret these citations as a direct attack on any assignment of weight to the October 12, 2015 cardiac catheterization / interventional procedure report of Dr. Asfour, Plaintiff's then-treating physician. (R. at 505-507, 379-381.)  Instead, Plaintiff cites these pieces of evidence to illustrate that the ALJ did not mention the 100% occlusion, the shoulder tears or the MRI.  (DE 13 at 9-10.)  However, even if the ALJ's written decision does not expressly mention Plaintiff's 100% blockage or occlusion, it was discussed at the February 15, 2017 administrative hearing, during her counsel's opening statement *and* upon examination by the ALJ, and the written decision unquestionably considers Plaintiff's CAD.  (R. at 42, 67, 27.)  The SSA classifies jobs as "sedentary, light, medium, heavy, and very heavy."  20 C.F.R. §§ 404.1567, 416.967.

The ALJ determined that Plaintiff was limited to sedentary work, the most restrictive of the exertional categories, "with additional restrictions[,]" which included postural, manipulative, and environmental limitations.  (R. at 25, 28.) The Undersigned agrees with the Commissioner that "Plaintiff fails to identify any additional RFC limitations that would be attributable to her CAD . . . , beyond the limited range of sedentary work found by the ALJ[.]"  (DE 14 at 9.)  Moreover, if Plaintiff is asking the Court to adopt Dr. Slaim's opinion that she is "functionally disabled from all gainful employment, including sedentary or less than sedentary

jobs[,]" (R. at 749), opinions as to whether an individual is disabled are reserved to

the Commissioner.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

Likewise, even if the ALJ's written decision does not expressly mention the

right shoulder tendon tears, her consideration of right shoulder MRI is obvious, not

only because she mentions Exhibit 15F as added to the record after the hearing, but

also because her RFC discussion acknowledges that "[d]iagnostic imaging also

corroborated the examination findings by showing the claimant had mild changes

in her shoulder and spine (EX. 15F)."  (R. at 20, 26.)  Indeed, the shoulder MRI

revealed, *inter alia*, "mild subacromial subdeltoid bursitis[,]" and "mild to mild

spur and subchondral cyst formation as well as moderate patchy marrow edema."

(R. at 752-753.)  Accordingly, the ALJ assessed manipulative limitations, which

included *occasionally reaching overhead* with the right upper extremity and

*frequently handling and fingering* with the bilateral upper extremities.  (R. at 25.)

Plaintiff contends that, given the MRI findings and the findings of her

treating doctor, presumably those within Dr. Asfour's cardiac catheterization

report, she "should be limited to *never* using the right upper extremity."  (DE 13 at

10 (emphasis added), 752-753, 691.)  Preliminarily, this difference between

"occasional" versus "no" overhead reaching with the right arm was explored by the

ALJ's first and third hypotheticals.  (R. at 91, 93; *see also* R. at 95-96.)  The ALJ

determined that Plaintiff had an RFC consistent with the combined first and second

12

hypotheticals, as to which the VE testified that such an individual could perform the jobs of surveillance system monitor or order clerk.  (R. at 25, 30, 91-93.)  True, as Plaintiff points out, at the administrative hearing, her counsel observed that Plaintiff had only raised her arm from her elbow to her hand when taking the oath, which Plaintiff agreed was due to her shoulder pain.  (R. at 83-84.)  (DE 13 at 9.)  Nonetheless, as the Commissioner points out, reaching, handling, and fingering, as well as feeling, are not present or do not exist in the surveillance-system monitor job.  *See* DICOT 379.367-010, 1991 WL 673244.  (DE 14 at 10.)   Thus, even if Plaintiff had been limited to never using her right upper extremity, she could still have performed the surveillance-system monitor job.

### b.   Mental RFC

The ALJ's review of Plaintiff's mental health impairments included citations to various records.  (R. at 27, 587-592, 295, 311, 312, 324, 410, 478, 341.)  In assigning "great weight" to Dr. Bray's adult mental status evaluation, the ALJ specifically referenced Dr. Bray's discussion of the four work-related mental activities, which included several moderate or moderate to significant impairments. (R. at 28, 590-591.)

Given the ALJ's assignment of "great weight" to the opinion of consultative examiner Dr. Bray, Plaintiff takes issue with the fact that the mental RFC limitations do not include "any amount of time off task due to attention and

concentration impairments."  (DE 13 at 10; *see also* R. at 42, 94-95.)  However,

after recognizing Dr. Bray's opinions on the work-related mental activities, the

ALJ further stated:

> The claimant's judgment behavior and though process were also
> normal.  There is no evidence of any inpatient psychiatric
> hospitalizations during the relevant period.  In her function report she
> revealed that she is able to do simple chores, cook simple meals and
> drive a motor vehicle ([R. at 232-239]).

(R. at 28.)

Tellingly, Dr. Bray noted that, during the examination, Plaintiff "was able to

perform simple repetitive tasks.  It is likely [she] could handle more complex

tasks."  (R. at 591.)  As such, the Commissioner is correct that "the ALJ was not

required to include a limitation for being off task due to problems with attention

and focus[.]"  (DE 14 at 11.)  In addition, the state agency psychological consultant

opined:

> Mental impairments do not significantly limit the claimant's ability to
> perform simple, low-stress, unskilled work on a sustained basis.
> Claimant is able to understand,  remember  and carry out 1-2 step
> instructions, handle supervision and interact with coworkers. This
> decision is based on analysis of evidence and is in line with the MSS,
> given moderate weight.

(R. at 113, 129.)  The ALJ found the state agency consultant's determination

"consistent with the evidence available at the time of . . . review of the record[,]"

and assigned it "some weight."  (R. at 27.)  Accordingly, there is substantial

evidence for the ALJ's mental RFC assessment, which, in addition to including

social interaction limitations, also included limitations of "simple routine tasks in a work environment free from fast-paced production requirements, . . . and involving only simple work-related decisions with few, if any, workplace changes."  (R. at 25.)

### 2.     Credibility

#### a.     Heart procedures

By way of background, Plaintiff was admitted to Oakwood Hospital and Medical Center (OHMC) on January 6, 2014 with a chief complaint of chest pain. (R. at 382-449.)  During this stay, Dr. Asfour performed:  (**1**) a left heart catherization; (**2**) a left ventriculogram; (**3**) a left anterior descending artery percutaneous transluminal coronary angioplasty (PTCA) and stenting drug-eluting stent (DES); and, (**4**) a right radial artery wrist band placement.  (R. at 387-390; *see also* R. at 300-302.)  Plaintiff followed up with Premier Cardiovascular Specialists, P.C. – Dr. Asfour – shortly thereafter.  (R. at 275-276, 279-287, 299-302.)  At the January 13, 2014 visit, Dr. Asfour gave Plaintiff a referral for <u>cardiac rehabilitation</u> and noted, "Aggressive risk factor modification including <u>smoking cessation</u>, <u>diabetes management</u>, weight loss and cholesterol management."  (R. at 276 (emphases added).)

Plaintiff was again admitted to Oakwood on July 8, 2014.  (R. at 450-498.)
That same day, a "5 French sheath" was placed in Plaintiff's right radial artery.
(R. at 496-498, 290-292; *see also* R. at 293-298.)

Plaintiff was also admitted to Oakwood on October 9, 2015, with complaints
of chest pain and shortness of breath.  (R. at 499-559.)  This appears to have been
Plaintiff's third heart attack.  (*See* R. at 105-106, 569.)  On October 12, 2015, "a 6
French sheath was placed in the [right] femoral artery[,]" and Dr. Asfour noted that
the distal circumflex was "occluded 100%."  (R. at 506, 380.)

As the ALJ later observed, Plaintiff has had "three heart attacks, which
required two heart stents within a six-month period."  (R. at 27.)

### b.      Evidence of non-compliance and continued smoking

The administrative transcript contains several medical records that comment
upon non-compliance, such as:

- Dr. Asfour's April 16, 2014 records, which note that
  "[u]nfortunately, she continues to smoke and she is back to 1-2
  packs per day[,]" and that there was "lengthy discussion with
  her regarding smoking cessation and the importance of smoking
  cessation."   (R. at 273-274.)

- On May 15, 2014, Dr. Asfour noted that Plaintiff "continues to
  smoke despite all the recommendations we discussed with her
  about smoking cessation."  (R. at 272.)

- On July 22, 2014, Plaintiff had an abnormal ECG.  (R. at 278.)
  Dr. Asfour's same-day letter notes that Plaintiff had stopped
  smoking and that "[s]he refused cardiac rehab due to *high*

*expense on her co-payments*."  (R. at 270-271 (emphasis added).)

- On September 15, 2014, Dr. Asfour noted that Plaintiff "unfortunately continues to smoke.  She has been trying to stop and had some hypnosis but without success."  (R. at 269, 353.)

- On January 27, 2015, Plaintiff had an abnormal ECG.  (R. at 277.)  Dr. Asfour noted that Plaintiff "is very much noncompliant.  Continues to smoke one and half a pack a day . . . ."  (R. at 268, 352.)

- May 4, 2015 records from either Dolson or Abraham Slaim, D.O., note that, as to obstructive sleep apnea (OSA), Plaintiff "states did not follow up with second portion of test a few years ago."  (R. at 329.)

- October 12, 2015, Plaintiff underwent a cardiac catheterization, and Dr. Asfour "[r]eemphasized smoking cessation."  (R. at 505-507, 379-381.)

- On October 16, 2015, Dolson noted that, as to diabetes, Plaintiff was "compliant with education[,]" but "non-compliant with follow up and medication."  (R. at 336, 560; *see also* R. at R. at 341, 345-346, 565, 569-570.)

There is some evidence that Plaintiff quit smoking in October 2015.[7]  However,

Dr. Kondur's May 24 & 31, 2016 notes reflect a 10-19 cigarette per day habit and

Dolson's November 8, 2016 notes indicate that she is a non-compliant diabetic,

smokes 1 pack per day, and "is not ready to quit at this time[,]" and was "advised

---

[7] Plaintiff underwent an exercise stress test on October 19, 2015, the notes for which indicate that she quit smoking on October 9, 2015.  (R. at 288-289, 574-575, 579-580.)  Moreover, Dr. Asfour's January 4, 2016 notes, which were accompanied by a "possible abnormal ECG," reflect that Plaintiff quit smoking in October 2015.  (R. at 576-578, 616-618.)

about risks of continuing to smoke, uncontrolled blood sugar, high cholesterol, hypertension . . . ."  (R. at 691, 699, 704-705, 740, 743.)

Plaintiff's compliance with treatment was also addressed at the February 15, 2017 hearing.  Among other things, Plaintiff was asked, "When your doctors give you treatment or recommendations, things that you need to be doing, telling you how often to take your medication, and in which doses to take your medication, so on and so forth – are you compliant with your doctor's instructions?"  (R. at 69.) Plaintiff answered, "Taking my medication, absolutely."  (*Id*.)  However, when asked about "pretty consistent recommendations that [she] stop smoking[,]" Plaintiff admitted she had not stopped, although she had "tried everything, literally[,]" and she was still trying to quit.  (*Id*.)  She also stated that she had been successful in cutting back.  (R. at 70.)  She further testified:  "my insurance will not cover an MRI for my neck, my shoulder, my arm.  They have denied it now, I believe, two times or three times and – *for my lower back*."  (R. at 72; *see also* R. at 73 (emphasis added).)

### c.      The ALJ's credibility determination

In her May 22, 2017 decision, the ALJ concluded that Plaintiff's statements about the intensity, persistence and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record . . . ."  (R. at 26.)  Plaintiff's credibility argument concerns:  **(i)** her alleged non-

compliance with treatment for CAD; **(ii)** her alleged non-compliance with

treatment for diabetes; and, **(iii)** the ALJ's omission of much of her February 15,

2017 testimony regarding daily living and general limitations in favor of the

representations in her January 20, 2016 function report.  (DE 13 at 11-12.)

Importantly:

- As to Plaintiff's CAD, the ALJ noted that Plaintiff was "non-compliant with treatment[,]" and that treatment notes "show that she refused to go to cardiac rehab[.]"  (R. at 27.)  This statement is supported by Dr. Asfour's July 22, 2014 note that Plaintiff "refused cardiac rehab due to *high expense on her co-payments*."  (R. at 270-271 (emphasis added).)

- As to Plaintiff's diabetes, the ALJ cited, *inter alia*, records indicating that Plaintiff "never checks her [s]ugars," and "is non-compliant with follow up and medication."  (R. at 26, 309, 560.)

- In addition, the ALJ assigned "some weight" to Plaintiff's function report.  (R. at 28, 232-239.)

Plaintiff addressed cardiac rehabilitation, diabetes treatment, and her

testimony, among other issues, in an October 1, 2017 letter to the Appeals Council.

(R. at 193-194.)  On March 23, 2018, the Appeals Council acknowledged

Plaintiff's argument that she was unfairly considered non-complaint for having

refused cardiac rehabilitation, because she was unable to afford it.  (R. at 1.)

Having determined that the ALJ "did not abuse her discretion and none of the other

reasons in our rules exists to review [Plaintiff's] case[,]" the AC denied her request

for review.  (*Id.*)

### d.    Plaintiff's insurance status, her ability to co-pay, and treatment for CAD

Citing Dr. Asfour's July 22, 2014 note, seemingly for its statement that Plaintiff "refused cardiac rehab due to *high expense on her co-payments*[,]" (R. at 270-271 (emphasis added)), Plaintiff contends that she "was unable to go to cardiac rehab because she did not and does not have the money to pay for the rehab[,]" and her "medical insurance cut her off at that time and she would have had to pay out of pocket for the rehab with money that she simply does not have." (DE 13 at 11.)

At the outset, *Plaintiff's counsel's statements* about what Plaintiff can and cannot afford, unaccompanied by citation to some type of financial record, are unconvincing.  Moreover, to the extent Plaintiff relies upon her doctor's remarks, Dr. Asfour's September 15, 2014 record simply notes, without further explanation that Plaintiff "refused to go to cardiac rehab."  (R. at 269, 353.)   Also, while the Court has noticed an OHMC Cardiac Cath Lab record that "Patient has no active insurance coverage *on file* for [January 6, 2014][,]" (R. at 370 (emphasis added)), she seems to have been covered by Blue Cross PPO or Molina at the time of her January 2014, July 2014 and October 2015 visits to OHMC.  (R. at 382, 450, 499.) She also seemed to have insurance at the time of the February 15, 2017 hearing. (R. at 72-73.)  Thus, I am inclined to agree that the record "does not reflect an inability to pay due to a loss of insurance . . . [,]" and "there is no indication she

was *unable* to pay [the high co-pays][,]" only that she "refused" to do so. (DE 14 at

13-14 (emphasis in original); R. at 269, 270-271.)

Moreover, even if Plaintiff was unable to afford her copayment to go to

cardiac rehab, the ALJ *also* stated that Plaintiff was "non-compliant with

treatment[,]" for which the ALJ expressly pointed to the letters about smoking. (R.

at 27, 268, 272, 352.) As the Sixth Circuit has stated:

> . . . we can take judicial notice of the massive body of medical opinion
> supporting the advice the claimant received from his doctor on the
> subject of cigarette smoking. The Social Security Act did not repeal
> the principle of individual responsibility. Each of us faces myriads of
> choices in life, and the choices we make, whether we like it or not,
> have consequences. If the claimant in this case chooses to drive
> himself to an early grave, that is his privilege—but if he is not truly
> disabled, he has no right to require those who pay social security taxes
> to help underwrite the cost of his ride.

*Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988)

(internal footnote and paragraph break omitted). Thus, there is other support for

the ALJ's conclusion that Plaintiff was noncompliant with treatment.

### e. Diabetes treatment and medications

Plaintiff takes issue with the ALJ's statement Plaintiff "had admitted

*instances* of medication non-compliance[,]" for which the ALJ cited *one* record -

Dolson's October 16, 2015 notes. (R. at 26 (emphasis added), 560.) However, the

notation that Plaintiff "is noncompliant with follow up and medication[,]" may, as

the Commissioner asserts, "be fairly read as reflecting an on-going pattern of non-

compliance[.]"  (R. at 560, DE 14 at 14.)  Moreover, while Plaintiff generally cites

approximately 100 pages to illustrate that "despite the compliance she continued to

have diabetes complications[,]" (DE 13 at 11, R. 635-736), the Commissioner

points out that other records are "reflective of non-compliance with treatment

regarding her overall health, including diabetes treatment[,]" such as Dolson's

October 16, 2015 notes that Plaintiff was not taking her medication (R. at 341, 346,

565, 570) and Dolson's November 8, 2016 notes that Plaintiff is a "noncompliant

diabetic" (R. at 691, 699, 704).  (DE 14 at 14.)  And, as noted above, the ALJ cited

Plaintiff's own admission to medical personnel that "'she never checks her

sugars.'"  (R. at 26, quoting R. at 309.)  Thus, the ALJ's statement is not materially

inaccurate.  Also, "[n]oncompliance is a sufficient reason to discount credibility."

*Reid v. Comm'r of Soc. Sec.*, No. 14-CV-11455, 2015 WL 5026118, at *9 (E.D.

Mich. Aug. 25, 2015) (Murphy, J., *adopting report and recommendation of* Patti,

M.J.) (referencing *Sias*, 861 F.2d at 480).

### f.    Plaintiff's testimony and summation

Finally, while the Court agrees that the ALJ did cite to Plaintiff's January

20, 2016 function report more than her February 15, 2017 testimony, the ALJ

acknowledged the age of the function report when assigning it "some weight

because it was completed over a year ago."  (R. at 26, 28.)  The ALJ characterized

Plaintiff's testimony as "she can no longer work due to mental disorders and

chronic musculoskeletal pain[,]" and "she wear[s] braces for her carpal tunnel syndrome."  (R. at 26; *see also*, *e.g.*, R. at 47-48, 70-71.)  Yet, the ALJ also cited Plaintiff's function report when noting that certain "reported activities of daily living . . . [,]" namely concerning dog care, personal care, cooking and cleaning, "are generally inconsistent with the degree of functional limitation alleged."  (R. at 28; *see also*, *e.g.*, R. at 233-234.)  The ALJ was not required to explain why she discredited each of the specific limitations about which Plaintiff testified at the hearing, and, in any event, Plaintiff's argument in this regard does not identify any contradictions between the "daily living and general limitations" described in the function report versus Plaintiff's testimony regarding those areas.  (*See* DE 13 at 11-12.)  In the end, as the Commissioner correctly points out, "[t]he ALJ's credibility findings are unchallengeable[.]"  *Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 113 (6th Cir. 2010).  (DE 14 at 14-15.)

### F.    Conclusion

Plaintiff has the burden of proof on her statements of error.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) ("during the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five.").  Plaintiff has not shown legal error that would upend the ALJ's decision.  For the foregoing reasons, it is **RECOMMENDED** that the Court **DENY** Plaintiff's motion for summary judgment (DE 13), **GRANT** Defendant's

motion for summary judgment (DE 14), and **AFFIRM** the Commissioner of Social Security's decision.

## III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated:  July 31, 2019                              s/*Anthony P. Patti*
                                                   Anthony P. Patti
                                                   UNITED STATES MAGISTRATE JUDGE